23-6385 Good morning. Good morning. May it please the court. Ian Marcus Amelkin of the Federal Defenders of New York on behalf of Mr. Barnes. In this case, the District Court erred in two ways. First, it denied Mr. Barnes' request for a suppression hearing when there were material facts in dispute. That went to the validity of the search, and the government submitted no affidavits from law enforcement. This error is reviewed for abuse of discretion. The two material facts that were in dispute was one, whether the officers who stopped Mr. Barnes had a full description of individual one, the person, an off-duty officer, allegedly saw shoot a gun in the air, who everyone agrees the government and defense was not Mr. Barnes. The District Court was prepared to assume that they had all the information, correct? That's correct, Your Honor. And number two, whether it was immediately apparent to the officer that patted down Mr. Barnes' backpack that there was a gun inside the bag. And the second error, which goes to your question, is the holding that even if a hearing made clear that the officers had a full description of the alleged shooter, the outcome and the denial of Mr. Barnes' suppression motion would have been the same. And this is abused, this is reviewed de novo. In the alternative, the court may reverse the District Court's denial of suppression without a hearing because the officers that patted down Mr. Barnes' backpack squeezed it and manipulated it for a period longer than necessary under the plain field doctrine, and therefore the evidence must be suppressed. What description the officers had is a disputed material fact? Individual one was described as- How is it disputed if the District Court assumed the facts favorable to your client? That's a great question. I could skip ahead to the meat of that. Well, I'm just wondering whether we really have to be concerned about whether there's a dispute, at least on your challenge to the District Court's ruling. Well, I think if the court agrees that the District Court's legal conclusion is incorrect, then no, and this court can send it back for either a hearing or can just say that suppression should have been granted in this case. But I think that the hearing was so pivotal in that these facts could have been explored further and the District Court could have seen that the Terry standard wasn't met and therefore suppression should have been granted. The legal question, as Judge Raggio, you got to, is whether there was a particularized and objective basis for suspecting the particular person stopped was engaged in criminal activity. That's Terry. And in Kansas v. Glover in 2020, Justice Thomas wrote for the majority that the presence of additional facts might dispel reasonable suspicion. Here, the District Court is incorrect that when it held that he met the general description and therefore even if the officers had this information, suppression still wasn't warranted. Well, the description was someone with a white t-shirt or a white shirt, red shorts, and a black backpack, correct? And African American or Hispanic, correct? Well, the full description- No, I'm using just the description that you take exception to, that it was a partial description, correct? That's correct, Your Honor. But Judge Raggio just suggested, and correctly, that the District Court said that even if they had the full description, which included height, weight, age, that suppression would not be appropriate. If the court agrees that- Well, what they did have was, and so it's not, whether it is or is not clear as to what they had, we can look at the record that's assembled. But we do have video, officer video, or video from the officer's vests, various officers, that actually stopped your client. That's correct. He had a white t-shirt with red shorts and a black backpack, did he not? And he was African American. Well- Just answer my question. No, because the white shirt was covered in a design that was covered in pictures. It was a white shirt that had a design on it. That's correct. Okay. And so you say that's a difference that then went to reasonable, for Terry Stock, a reasonable suspicion to stop someone? No, that's not my argument, Your Honor, because the full description- Well, let's just stick with the facts that are present in the video for a second. Okay. Are you saying that from the facts that are present in the video there was no reasonable suspicion to stop him premised on a description of white shirt, red shorts, African American male with a black backpack? I think that's a closer question, Your Honor, but it's not the facts of this case. Because the sergeant who saw individual one said that he was between 5'5 and 5'8 in his late teens or early 20s wearing a white t-shirt. My client is 6'1 in his 30s. He also said he had a slim build. My client is muscular. And so that is the core of the issue. I wasn't impressed that he was muscular, but in any event- That's objective, right? Muscular is in the eye of the beholder, perhaps, counsel. Right, and that's why hearings are so important, so that, Judge Wesley, you could have viewed my client during the course of the hearing, determined his build, and compared it to the description that we argue is a disputed fact and therefore a hearing needed to be held. We have precedents, though, that have upheld stops despite discrepancies in height and weight. And here, as Judge Wesley pointed out, there are a number of other factors that match. So given that precedence, how do we find that there was an abuse of discretion here? Well, the answer is twofold. First, I have not found one case where the court denied a hearing with this type of dispute. The cases that the government cites, both Laws and Jackson, there was a hearing. And in Laws, the court reached a decision after it reviewed the mugshot in evidence and compared it to the defendant and heard evidence about why they thought the defendant matches the mugshot. Critically, in that case, the defendant acted suspiciously, moving his hand so it was no longer visible. In Jackson, the defendant was in a car, and his height, age, race, and hairstyle all fit the description. And the officers believed that the driver was acting suspiciously. There's no argument here by the government or anyone else that Mr. Barnes was acting suspiciously. This court recently had a hearing in Bonk and Weaver, and it found in the majority opinion that unusual, evasive, or furtive behavior, especially in the precedence of law enforcement, is often the critical factor. And Judge Laugier, in your concurrence, you wrote that it didn't rise to reasonable suspicion until the defendant behaved abnormally and without explanation and appeared to go at great lengths to conceal something. And then why— If I may interrupt you for a minute. Yes. As I understand it, the officers were responding to a call of a daylight shooting in the vicinity of where your client was found by a man wearing red shorts with a black backpack, white T-shirt, and with the age and weight description. They see a man wearing red shorts with a black backpack with a white shirt, albeit one with a design. You don't think that responsible law enforcement would have been to stop him and find out who he was and what he was doing in that area? There had just been a daylight shooting. No, Your Honor, because the height and the height, age, and weight discrepancies, plus the differences in clothing. My client is wearing a red hat, a bandana. He's holding a drink. He's talking on his cell phone, smoking a cigarette. He's half a foot taller than the alleged shooter and a decade older. If the lies— Let me ask you about the age, because like Judge Wesley, I have seen the video. He's masked. Do you think you could tell his age in those circumstances? I think so, Your Honor, because they—and the video is from further away. The closest officer to him could see his face and see. I don't think anybody would confuse somebody in their mid-30s for somebody who's 19, especially when the height difference is so clear. If you look at Watson— Yes, but the reporting officer wasn't that close to him. So the possibility that the reporting officer—that's why you don't necessarily give much weight to these height and age things because there's such a possibility for variance. Well, I think that, as the court knows, it's a totality of the circumstances. And here we have such a huge difference between age, height, as well as the clothing not matching correctly. We're closer to Watson, 2015, where in that case the suspect was described as a 19-year-old black male, 5'10 to 6 feet tall, black hair, 155 to 180 pounds. You didn't say a word about what he was wearing or backpack or anything. But in that case, you're on— So I'm suggesting to you that—I strongly suspect that in the area where your client was found, I mean, he wasn't—he turned out not to be the—he was not the fellow that fired the shots, obviously. But you don't find it a bit—reducing the number of possible hits that when you say red shorts, white shirt, and black backpack, you don't find that specific enough for an officer to say, geez, I think I ought to ask that fellow. I ought to stop that fellow. You don't think that's enough? It's not enough. You and I both have red ties on. That's correct. And I shoot off a gun outside on Foley Square and say, white guy, older guy, extremely good looking, with a dark suit and a red tie. And you're walking away after an incredibly good argument, feeling good about yourself, and the police stop you and say, hey, you've got a red tie on. That's not enough? It's not, Your Honor, because— Okay. And secondly, if we stood next to each other, right, no reasonable officer would confuse us. It's not to say that you're so much older than me, but we just look too different. Now, you know, now you're going. Now you're—you were doing okay there for a while. Thank you, Your Honor. I'll go back to flattery. Fair enough. Fair enough. If you look at this circuit's precedent, it is clear, Watson, McGinley, that if you somewhat match the description, it is not enough. There has to be something that links— And what is it that you—remind me, what is it that you want in connection with this issue? I want a suppression hearing, which it seemed to me like a slam dunk. You have a suppression hearing when there are disputed issues of material fact. It is not a high standard. What's your viewpoint? What's that? Well, that's the circuit's viewpoint. We wrote a detailed brief that showed the facts in dispute, and we're entitled to a hearing under Pena and its progeny. May I ask you a question about the satchel? Yes, Your Honor. Thank you for your research, because we kept you past your time as it is. Assume, for purposes of my questions, that we find the stock adequately supported. So now the only question is the backpack. They're investigating a shooting. You don't think they have authority under Terry and its view that you get to pat down, check that the person isn't armed, that they don't have the ability to pat that backpack and indeed to open it before they question him to make sure he can't get a gun from it? I was with you until the last clause of your question, Your Honor. Under Terry, the question is, a pat down for weapons is limited to that which is necessary for the discovery of weapons which might be used to harm the officers or officers nearby. Now, in addition to patting him down, he's got a satchel with him. Yes. He's got a satchel. It is a shooting that's under investigation occurring within a half an hour of this stop. You don't think they can open that backpack before they question him to make sure that he can't grab a gun from it? Well, he couldn't grab a gun because he's surrounded on all sides by four officers. His arms are secured. And at that point, Your Honor, it has to be immediately apparent from the feel of the exterior of the backpack that there is a gun in there. What case do you rely on for that as opposed to them just being able to feel a hard object? Minnesota v. Dickerson. The lead case says it has to be immediately apparent. But Minnesota v. Dickerson involves quite different circumstances here. Sorry, Your Honor? Isn't that a border stop? No, that's a different case. That's a bond, which is the bus case. Your Honor, I think that Your Honor is perfectly correct that the officers were searching for somebody who they believed could fire a weapon in the air. But the appropriate course of conduct- Here, the concern is that they're stopping someone who they think may have recently been involved in a shooting. And so I don't see how once they detect a heavy object- And, again, I've seen the video. It's obvious they have found something in that corner. They can feel something in that corner that they don't get to assure themselves it's not a gun. Well, the case law cuts the other way, Your Honor, because what we have here is an affidavit from my client saying that the backpack was thick leather, that the gun was wrapped in clothes. And the officers- You can see in the video that they have felt something. Yes. And in order to open it- The suggestion of your client's affidavit is this was so thick you couldn't feel anything. That's belied by the video. Or do you take a different view? I think that goes to why a hearing was necessary. Judge Ramos should have felt the backpack and made that determination on his own. But to your point, and I think it's critical, here the sergeant was a couple blocks away. We don't have a warrant here. So Mr. Barnes is not a danger to anyone. He is restrained. They feel the exterior of the backpack. They feel something. But they do not know for sure whether or not it's a gun. They do a show up like under five minutes later and they say, no, that's not the guy. They still arrest him, of course, because he had a gun. But stick with the backpack. Right. So what you do there is- He's surrounded. He's not restrained. Well, they're holding his arms. So he is seized under Terry. And the sergeant showed up and said he's not the guy. If he said that's the shooter, at that point you have probable cause to arrest. And you could do a search incident to a lawful arrest and you can seize the backpack. But here we never get to probable cause that he is individual one. We don't at all. Instead what we have is officers exceeding the limits of Terry by feeling the exterior of a backpack and opening it where there's no exigency and there's no danger to them. And for- Your position is that they had no authority to touch the backpack at all. No, they can touch the backpack. You can feel the exterior of the backpack. Right. But you cannot squeeze and manipulate it in a manner to basic- It's exactly the same- No, it would seem that's the Minnesota case. But that's relative. They weren't looking for a weapon after that in the Minnesota case. They were just kind of feeling around. That's not this case. This case is the fellow has a weapon. That was the case- So you either have to concede that they were allowed under the Terry stop to, at least for officer's safety, to pat him down for a weapon. Once you've conceded that, then it seems to me that once they have some kind of sense that they're touching something, when you see the officer, he reaches, he touches the backpack, and then he squeezes down as if he's squeezing down a barrel. Then he zips it open. And the minute he sees, he looks inside the backpack. Immediately, I mean immediately, less than two seconds later, they start, they grab this guy even more, and they cuff him. Well, it can't, I mean, with all due respect, I doubt he saw a shirt. Fair enough, Your Honor, and that's why a hearing would have resolved that point. But, Your Honor, you notice he unzips the wrong part of- This is not where they find a weapon, and then they continue to search. That's the Minnesota case. That's also Thickerson. Yeah. This is, they've been told that someone with red shorts and a white shirt has a weapon. You've conceded that he fits within Terry. And you initially, in our conversation with you, conceded that they had, that for officer's safety standpoint, notwithstanding that they were held, I would have thought you would have said they had no reason to even pat him down because he was held by four officers. But that's not what you've argued to us. Well, I have argued- Once you've conceded that they can touch that backpack, as a part of appropriate conduct within Terry for officer's safety standpoint, the officer's interpretation of what he or she is feeling suddenly becomes relevant and seems to be under Terry. They can follow up on it. So two points to that, Your Honor. I haven't conceded that the stop was legal at all. They should never have stopped him because the descriptions don't match. I didn't say you conceded the stop was legal, but I said once you've characterized it as a Terry stop. Yes. And, Your Honor, this circuit's case law, and especially in the district courts, it makes clear that Dickerson is not limited to drugs or what have you. That Dickerson is used to find guns. If they found a gun in his waistband and then they continued to pat him down, that would have fit right within Dickerson, wouldn't it? Well, I think it's separate, Your Honor. The question is whether or not there's reasonable suspicion based upon the, sorry, whether or not it's immediately apparent from the feel of the exterior of the backpack that there was a weapon inside of it. It has to be immediately apparent. And I don't think it was here because even accepting the court's conclusions from the video that it was slack and that they saw it, he unzips a different compartment, doesn't find a gun. Your view is that the video is ambiguous as to what he was perceiving and that you want the officer to testify to flesh out what he perceived. I think that the government did not submit an affidavit. Okay. And that the government did not submit the backpack for the court to review. And the government did not allow the defense to cross-examine the officers to see what they objectively thought. The court ruled that they didn't have to. All right. Thank you. We've kept you well past your time, but you've helpfully answered the questions, so we'll hear from the government. Thank you, Your Honor. Please reserve two minutes for rebuttal. Thank you very much. Mr. Robinson. Good morning, Your Honor, and may it please the court. Edward C. Robinson, Jr., I represent the United States in this appeal, and I represent the United States in the court below. First, I'd like to start off with Dickerson. The appellant here argues that Dickerson prohibits manipulating objects through touch of determined identity if it is not immediately apparent that the object is a weapon. That is not what Dickerson holds, and if it did, it would fly against the logic of Terry. What Dickerson holds is that during a frisk, once the officer rules out a weapon, they can keep searching as long as the object that they have felt is immediately apparent that it's not threatening contraband. And this is absolutely consistent with Terry. Terry is a protective search. It's to assure that the officer can make sure that he's not in danger and that no one else is under danger. If an officer feels an object and they reasonably believe that it could be a weapon, they're allowed to continue to search until they are sure that it is not a weapon. To conclude otherwise would be basically playing blind man's bluff, as Judge McCasey says in United States v. Rogers, with a weapon. And I think Rogers is actually cited in the appellee's brief, but he doesn't actually provide a complete quote because Dickerson says that you have to rule out. What is it? I'm moving past Dickerson. With respect to the request for an evidentiary hearing, which is a reasonable request in a context like this, what is it that the district court had before it? It had the videos, it had the audio, it had what else? It had an affidavit from defense, is that correct? Right. So they had two affidavits from Barnes, but they also had the body-worn camera from several officers, so you can see it from different angles, which the district court reviewed. They also had the 911 call where the off-duty officer is providing the description to the 911 dispatcher, and also at the end toward the officers that later on stopped Barnes. You also have a recording of the radio run as well, which involved the description being radioed out to all the officers. So when we're trying to assess whether or not a district court has abused its discretion in this context, and it rests at least in large part on a discrepancy between the description, the full description and a partial description, say, how do we assess that? What's the best case for us to look at? In terms of, I think, assessing that, you have to look at all the—I don't have a case in mind, but I think— I mean, let's put it this way. So as Wesley pointed out, his description with the red tie, and we could spin out a number of different hypotheticals, but here, let's say that there's a white shirt with a white patterned shirt, red shorts, black backpack, but the fact that he's got a hat and a bandana, and I don't know, maybe you'll be able to help me determine this, how long after the shooting occurred that he was found. The fact that he's got a bandana, obviously he's older, he's more muscular and so on. If there were more differences between the description and what the officers actually saw when they encountered Mr. Barnes, how do we assess whether an evidentiary hearing is necessary? At what point are the differences or discrepancies so significant that an evidentiary hearing is triggered, or is that just so factual? I think an evidentiary hearing isn't necessary because there's evidence already about what description they had, and then you also have body-worn camera showing what he looked like. So the off-duty officer didn't mention, but he was there from some distance, that headwear or the mask. But the fact is he was found about .2 miles away, about a four-minute walk from where the shooting occurred, in the direction of where the shooter was last seen going into about five minutes after the shooting, and they see this individual. And for the purposes here, Judge Ramos assumed they had the full description. So no hearing is necessary. I think the appellant here keeps emphasizing you can ask the officer what he looked like, but everything's on video, and the video's undisputed, and you can make reasonable inferences from watching the video. It's close enough. So as Judge Ramos said, it's close enough. Yes. That's it. And that's enough to avoid an evidentiary. That's correct, Your Honor. And then I also want to address the reasonable suspicions analysis there, just to pick up on what Judge Loewe stated. If not, there are cases that address the differences, and those cases include, you know, United States versus laws, where you do have that age difference. You have the person described as 20, black, male, 160, 5'9", 5'9", tall, and yet they find someone else who's 10 years older and 40 pounds heavier. It goes to the fact that reasonable suspicion is not a high-threshold, and it can exist with some differences in appearance. Here, the differences there is the appearances are close enough, but then you also have the proximity to where it occurred. And the appellee also addressed Watson. Watson's in opposite there. The officers there, when the officers had arrested the person they were looking for, they had a picture of the person there. So there was material differences between the person's staff and the description they had. Now, I do want to shift, because I think it's important to kind of go over, I think, the body-worn camera, which Judge District Review and your Honors have certainly reviewed here. And the point I want to establish is that, just as Judge Rodney said, they concentrate immediately on that lower right-hand corner, and they clearly identify an object which could be a weapon. How do you know? As soon as he feels that lower right corner, he asks the defendant, what do you have in your bag? And then Barnes responds, you know, ID, wallet, and stuff. And that doesn't dispel the suspicion. So even if you assume that the affidavit is true, that the gun was wrapped in a sweater, in a pair of jeans, and was disassembled in July, the officers could still feel it, because you hear later in the body-worn camera, specifically Exhibit E toward the end, Officer Callanan, who initially feels it, says, you know, I could feel. That's why you started with the bag. You could feel it through the back. And even if you assume that they weren't sure it was a weapon, under Terry and Dickerson and Oates, they'd still be entitled to make sure that it is not a weapon, and they could continue to manipulate and confirm that what's in there is actually not a gun. And also at that point, when Barnes gives that response, Officer Callanan and Officer Eller exchange a look. And then Officer Eller continues to feel that side of the bag before he looks inside and then he visibly reacts. So your friend on the other side says that the police officer who's in front of Mr. Barnes is holding his arms, and you would agree he's in custody at that point? So there is one individual, Officer Eller, who just holds his arm while the frisk is happening, and that's to make sure that he's not- Did you say arm? Is it arm or arms? One arm. He has one arm. He's touching one of Barnes' arms, not both arms. I think the point is that in answer to your strategy questions, that he's surrounded by police officers, one officer is holding an arm. I thought it was actually sort of really- It's more touching, Your Honor, really, than holding. Sort of hugging, but light hugging. And so there was no danger at that point. I wouldn't say there wasn't any danger at that point. The danger that he would be able to reach into his backpack, which is on his back, for a weapon. I think the danger is definitely still there. I do think that, but help me out. I mean, it was a stop for the purposes of Terry. Barnes was not in cuffs. No one was holding his hand back. So if he were held, both arms were held, and there was a police officer on either side and in back of him, then you would say that the danger had dissipated. If he was in cuffs and the book bag was- Both arms are held by the police officer. If the arms were held by the officer, strongly held, and the book bag was off, then I think the danger would have dissipated for the officers. So then you couldn't first kill him? You could still frisk him. What's the difference between frisking his person and feeling his backpack? I just want to understand what lines you're drawing here. Under Terry, you can frisk all of his outerwear. That includes a book bag, if he has the book bag on him. I understand that, but if I also understood you correctly, you just agreed that if they were holding his hands, they couldn't search or couldn't feel the backpack. Did I misunderstand? I think the position is that if he was not able to reach the book bag, under circumstances where it reasonably considered dangerous, have completely dissipated- If you put somebody in cuffs, there would at least be a serious question as to whether there was an arrest rather than just a stop. Can we agree to that? That's correct, Your Honor. Now, are you taking the position that if you hold someone's arm, you are now crossing the line from a stop to an arrest? I'm actually not, Your Honor. I couldn't decide to be analogous to cuffs there, but holding someone's arm is insufficient. Are you aware of any case that says if you arrest, if you hold someone's arm or if you outnumber them with police officers or whatever, then you can no longer frisk incident to Terry? I'm not aware of any decision like that, and I don't think that would be consistent with Terry. So what is your position on this question? I'm having difficulty understanding what the government's position is. My position is that once they have that individual stop, they are permitted to frisk his outwear, including his clothes, including the back book bag that was on his back for any weapons. The adversary says no because through physical contact with his arm and through the position of the police officers, he was no risk. What's your position in response to that? I disagree with what my adversary said. I understand you disagree. Why? The officers have not ruled out that Barnes has any weapon there in that position until they're able to confirm that he has no weapon there permitted to frisk him. I'm sorry. So if he were cuffed and they had still not determined that he had a weapon, would they be permitted to feel his bag, frisk him, and look inside his bag? At that point, I think he'd be arrested and he'd gone beyond Terry. Well, thank you very much. So we'll hear some of that. Thank you, Your Honors. The Court's questions make clear that this is a very fact-specific determination that required a hearing. But going to the legal arguments made by the government, what they're basically asking this Court to hold is that any warrantless search of a bag, if the officers think the bag might have a gun, is fair play. I don't understand that to be their position. You suggested that because the person had his arm being held and it was outnumbered by the officers that they couldn't conduct a frisk. Do you have a case that so says in the context of Terry? I don't say that, Your Honor. They can do an exterior pat-down of the backpack under Terry if the Court agrees that the stop was fine, which of course it wasn't. And what do you rely on for the fact that they feel something, they feel it's heavy, but they're not sure what it is, that they can't open that bag? What are you relying on? Well, I rely on Casado, which is a Second Circuit case, which says that there's a fine line that has constitutional significance, and the police cross that line when they reach into a closed container. And that's what we have here. But does the Court talk about it in terms of that being on the defendant's person and therefore presenting a risk of danger? Well, I think that there is no danger here. There is no exigency because he's surrounded on all sides by officers. The Court, obviously, he seized under Terry. Terry doesn't speak of exigency. Terry speaks of their ability when they're stopping to make sure there's no risk of danger. Yes. Now, he's got a backpack. They haven't restrained him with cuffs. The possibility that people do foolish things and try to arrest themselves from police officers is not unheard of. And to that extent, it would seem to me that Terry allows them to search him and anything he's got access to to make sure there's no weapon. Why is that not a correct viewpoint in your argument? Because the Court must balance danger with constitutionality. And here, there's no- Where does Terry say that there's a balance in this? I thought Terry basically said that you can make sure there's no risk to the officers. Correct. And I think what you have here, Your Honor, is the appropriate way to have done this stop is if they feel the exterior of the backpack, they feel something hard, but it's not immediately apparent that it's a gun, you can cuff him under Terry without him being under- You would rather that they had cuffed him than that they had just made sure it wasn't a gun? Yes, Your Honor, because you're under the law. I'm just saying what the law says, which is that you're allowed to temporarily restrain under Terry. You could grab him closer if you feel something hard. Temporarily restrain under Terry means you can stop the person. You can prevent them from going someplace else. It doesn't necessarily mean cuffing. Now, I understand that sometimes we've upheld as a Terry stop a cuffed situation, but we've also held that it's a hallmark of an arrest to cuff someone. Yes, that's right, Your Honor. And here, you can do it any number of ways. You can take the backpack off of him, put it in the police car, wait until the sergeant shows up, and say, he's not the guy, and then you let my client go on his way. Unless you believe that you want to continue to search the bag because you felt like the hard object may have been a gun, you can request a warrant from the magistrate immediately and you can open the backpack. But as soon as we allow the unzipping of a backpack when there is no danger, you've gone afoul of Terry. And here the officers went afoul of Terry by feeling the exterior and manipulating it and squeezing it for 30 seconds and then opening it. It's your no danger conclusion that is the stopping point for me. I mean, I'm having trouble getting to that. Well, I think that's why, again, a hearing is necessary because we could hear what the department rules are in terms of a Terry stop. I think that four officers surrounding an individual in close proximity, or one of them has his arm on the suspect, and the backpack is unreachable. Unreachable at that, so the issue is unreachable at that precise moment? Yes, Your Honor. Not unreachable in second one when he tries to take off. And if he takes off, because there's an angle, right? And he then can get to that backpack. That's the issue. So the no danger, I'm not seeing it based on the video that I saw. We have to take the facts as they are. Your Honor, your concurrence in Weber is so important here because what we see is that there is no suspicious behavior, no furtive movements, no actions that show at all that Mr. Barnes is not complying with the police or that he is a danger to them. In fact, both of his hands are full. He is on the cell phone in one hand and he's holding a drink in the other, plus a cigarette. So what the court is basically saying is that it's a danger that he's going to drop both, somehow run around four officers, remove the backpack, unzip it, and take out the gun. It's just unreasonable. No reasonable officer would think that would happen here. And instead, what we have is officers who went a step too far by unzipping the bag. But I think that the court should find that the stop was bad because close enough would eviscerate all of this, all of your case law. Thank you. Thank you very much. Very helpful argument. We'll reserve decision.